UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

XAVIER EDISON,                                    Case No. 20-CV-0614 (PJS/LIB)

                    Plaintiff,

v.                                                            ORDER

NATIONAL RAILROAD PASSENGER
CORPORATION/AMTRAK and JOHN
DOE,

                    Defendants.

Ayodele M. Ojo, OJO LAW OFFICE LLP; Mark K. Thompson, MKT LAW, PLC, for plaintiff.

Alice D. Kirkland and Stephanie D. Sarantopoulos, LITTLER MENDELSON, P.C., for defendant National Railroad Passenger Corporation/Amtrak.

On May 29, 2019, plaintiff Xavier Edison boarded Train 8 operated by defendant National Railroad Passenger Corporation/Amtrak ("Amtrak"). Edison soon left his seat and moved to a seat within a block of empty seats that had been cleared by a conductor in anticipation of the boarding of a large group of passengers who were traveling together. Edison was asked multiple times by the conductor to return to his initial seat. Edison refused and was removed from the train at its next stop. Edison, who is black, now brings race-discrimination claims under 42 U.S.C. § 1981, 42 U.S.C. § 2000a, and 42 U.S.C. § 2000d, as well as claims for intentional infliction of emotional distress and

breach of contract under Minnesota law.[1]  This matter is before the Court on Amtrak's

motion for summary judgment.  ECF No. 46.  For the reasons that follow, Amtrak's

motion is granted.

## I.  BACKGROUND

### A.  Amtrak's Policies and Procedures

Amtrak is a commuter rail carrier that provides passenger service across the

United States.  Henin Decl. ¶ 2.  Amtrak's mission, goals, and expectations for its

employees are set forth in a manual titled "Standards of Excellence."  Sarantopoulos

Decl. Ex. D, ECF No. 49-8 at 2.[2]  That manual includes a policy on "Discrimination and

Harassment," which provides that "[d]iscrimination or harassment of any kind by our

employees toward our customers or fellow employees is inconsistent with our values

and will not be tolerated."  Sarantopoulos Decl. Ex. D, ECF No. 49-8 at 14.  All Amtrak

employees have received training on this policy, including the three employees

involved in the incident that is the subject of this lawsuit:  Road Foreman Russell

Sikkink-Spence, Conductor Kenneth Henin, and Assistant Conductor Ryan Grealish.

*See* Thompson Decl. Ex. G, Grealish Dep. 40:3–24; Thompson Decl. Ex. K, Sikkink-

---

[1]Edison's complaint included a claim for false-light publicity, *see* Compl. Count VI, but Edison later agreed to dismiss that count, ECF Nos. 36, 44.

[2]All citations to the record use CM/ECF pagination, except for citations to depositions, which use the pagination of the deposition transcripts.

Spence Dep. 72:16–73:13; Thompson Decl. Ex. L, Henin Dep. 30:8–23. There is no evidence that Sikkink-Spence, Henin, or Grealish has ever been accused of discrimination or otherwise been involved in disciplinary proceedings for alleged violations of this policy.[3] *See* Henin Decl. ¶ 29; Grealish Dep. 19:3–5; Sikkink-Spence Dep. 25:4–10.

Amtrak employees are also required to follow the company's Service Standards Manual, which details the "[p]olicies and [p]rocedures for maintaining customer safety." *See* Henin Decl. ¶¶ 7–8 & Ex. C. As is relevant here, the Service Standards Manual outlines the process for removing a passenger from a train. According to the manual, a passenger may be removed for a variety of reasons, including improper conduct, intoxication, and obscene language. Henin Decl. Ex. C, ECF No. 51-3 at 184–85. In addition, the Conditions of Carriage attached to each ticket provide that "Amtrak may refuse to carry passengers . . . [w]ho refuse to comply with safety or security rules or with instructions of Amtrak personnel." Henin Decl. ¶¶ 5–6 & Ex. B, ECF No. 51-2 at 29.

---

[3]Edison's complaint—which was signed by attorneys Karen Venice Bryan (who no longer represents Edison) and Ayodele M. Ojo (who does)—alleges that Henin "had been the subject of several prior complaints of race discrimination and related offenses, particularly in relation-to [sic] his treatment of passengers." Compl. ¶ 20. The record does not contain a shred of evidence supporting this allegation. Needless to say, neither a plaintiff nor his lawyers should publicly accuse a defendant of something as reprehensible as race discrimination without "evidentiary support." Fed. R. Civ. P. 11(b)(3).

The Service Standards Manual provides that the removal of a passenger should occur "only when other methods, including a firm request to the customer, have failed." Henin Decl. Ex. C, ECF No. 51-3 at 185. But the manual does not specify how many "firm requests" are required before a passenger is removed; that is left to the conductor's discretion. Grealish Dep. 16:8–14; Thompson Decl. Ex. I, Hlavaty Dep. 110:12–19. The conductor must call Amtrak Police or local law enforcement to assist with the removal of a passenger. Henin Decl. Ex. C, ECF No. 51-3 at 185. After a passenger is removed, the conductor must complete an incident report and fax it to the Consolidated National Operations Center. Grealish Dep. 14:4–7.

Passenger removals are not uncommon. *See* Sikkink-Spence Dep. 19:9–24; Hlavaty Dep. 24:6–7; Tiernan Decl. ¶ 5. Henin and Grealish recalled removing passengers for a variety of reasons, including intoxication, foul language, and refusing to wear a mask after the start of the pandemic. Henin Dep. 43:16–24, 45:8–18; Grealish Dep. 11:9–13:15, 15:19–17:14. But neither Henin nor Grealish could recall a single occasion on which a black passenger was removed from an Amtrak train prior to the removal of Edison. Henin Decl. ¶ 28; Grealish Dep. 18:3–6. Edison himself testified that he has ridden on Train 8 hundreds of times without issue. Thompson Decl. Ex. E, Edison Dep. 35:20–36:12.

## B.  The May 29, 2019 Incident

After finishing his shift at a casino, Edison purchased a $50 coach ticket on Amtrak Train 8 to travel from Detroit Lakes to the Twin Cities.  Edison Dep. 26:21–27:1, 36:25–37:24; Henin Decl. ¶ 11.  The train was scheduled to arrive at Detroit Lakes on May 29, 2019 at 3:15 am, but it was late and did not arrive until 3:56 am.  Henin Decl. ¶ 15.  Edison boarded the train and was told by either Grealish or Henin[4] that he could choose any open seat upstairs.  Edison Dep. 40:5–11.  There are no reserved seats in coach class, except for passengers with disabilities.  Henin Decl. ¶ 13; Grealish Dep. 20:13–16.  Edison found a set of two open seats and sat down.  Edison Dep. 40:9–11.  His ticket was scanned at 3:57 am, and the train departed at 3:59 am.  Henin Decl. ¶ 17; Sarantopoulos Decl. Ex. D, ECF No. 49-8 at 37.

The crew anticipated that a large group of passengers would be boarding the train at a later stop.  Henin Dep. 52:5–7, 105:3–10; Grealish Dep. 31:13–16.  The size of this group is unclear.  On the day of the incident, Henin repeatedly told Edison and others that a group of 40 passengers was anticipated.  *See* Edison Dep. 64:8; Sarantopoulos Decl. Ex. F, ECF No. 49-10 at 2; Sarantopoulos Decl. Exs. B-2 at 00:37–00:43 & B-4 at 00:09–00:12.  At their depositions more than a year later, though, neither Henin nor Grealish could remember the exact size of the anticipated group.

---

[4]Grealish testified that he greeted Edison.  Grealish Dep. 29:11–15.  Edison testified that Henin greeted him.  Edison Dep. 52:16–25.

Grealish Dep. 31:13–16, 51:24–52:4; Henin Dep. 68:1–6, 105:5–10. It is also unclear

whether the entire group would be boarding at Staples or at a different station, or if

instead various members of the group would be boarding at various stations. Henin

Dep. 64:18–22, 68:1–6, 104:21–24; Thompson Decl. Ex. N at 01:03–01:08. There is no

dispute, however, that the crew anticipated that a large group would be boarding the

train. Henin Decl. ¶ 22.

Amtrak's standard practice is to make every effort to seat groups together.

Henin Decl. ¶ 19 & Ex. C, ECF No. 51-3 at 187. Especially when a group boards in the

middle of the night when many passengers are sleeping, seating a large group in a

reserved area is safer and less disruptive. Henin Decl. ¶¶ 20–22. Therefore, Henin[5]

began clearing a block of seats towards the back of a train car for the anticipated group.

Henin Decl. ¶¶ 22–23. Henin asked several passengers—including white

passengers—to move in order to make space for the group. Henin Decl. ¶¶ 23–24.

Edison was sitting in his original seat and was not asked to move. Henin Decl. ¶ 24.

As part of his effort to clear space for the group, Henin directed a displaced

passenger to take the empty seat next to Edison. Henin Dep. 64:15–22; Sarantopoulos

Decl. Ex. F, ECF No. 49-10 at 2. Edison thought that the man smelled of alcohol, did not

---

[5]Although Henin was the conductor and Grealish was the assistant conductor, on
May 29, 2019 they switched roles as part of a training exercise. Grealish Dep.
29:23–30:3; Henin Dep. 48:21–25.

want to sit next to him, and moved to a seat within the block of empty seats that Henin had just finished clearing.[6]  Edison Dep. 40:11–17, 47:1–6.  Edison was the only passenger who tried to take a seat within that block of seats.  Edison Dep. 144:9–16, 145:9–12.  Edison sat down and fell asleep.  Edison Dep. 49:11–13.

Some time later, Henin woke Edison and told him that he needed to return to his original seat.[7]  Edison Dep. 50:2–21; Henin Dep. 77:9–23.  Edison refused to move, protesting to Henin that there were no reserved seats in coach.  Edison Dep. 51:1–2, 52:2–6, 64:16–65:3.  Henin explained that the block of seats was reserved for a group of passengers that would be getting on the train.  Edison Dep. 52:2–6, 63:16–22.  Edison replied that someone could sit next to him if necessary.  Edison Dep. 52:2–6.  Henin warned Edison that if he did not return to his initial seat, Edison would be removed from the train at the next station.  Edison Dep. 50:18–24, 52:8–9, 64:16–65:3.

---

[6]Henin wrote in his Passenger Incident Report and then later testified at his deposition that Edison protested having the man sit next to him, and that Henin explained to Edison that he had to move the man because Henin was clearing space for a group.  Henin Dep. 65:11–15, 69:22–70:20; Sarantopoulos Decl. Ex. F, ECF No. 49-10 at 2.  Edison did not mention this interaction at his deposition.

[7]Henin testified that he also told Edison that Edison could move to a different car.  Henin Dep. 77:9–23, 124:6–8.  But at his deposition, Edison denied that Henin told him that he could move to a different car.  Edison Dep. 82:18–83:5.

After this interaction, Edison called two friends and Amtrak police.[8]  Edison Dep. 52:11–15, 53:12–23, 54:15–22.  Edison does not recall discussing race during any of these phone calls; instead, he wanted to alert his friends as to what had occurred, and he hoped that Amtrak police would be able to defuse the situation.[9]  Edison Dep. 60:8–61:9.

Edison also testified that Henin may have returned while Edison was on the phone with Amtrak police and again asked Edison to move.  Edison Dep. 79:14–25.  The parties agree that Henin gave Edison several warnings, but the exact number is unclear.  Edison Dep. 140:20–141:4.  At his deposition, Edison testified that, during their interactions, Edison felt that Henin was being rude and was singling him out due to race, even though neither Henin nor Edison said anything about Edison's race at the time.  Edison Dep. 134:24–135:21, 137:12–17, 154:4–9, 171:9–16.[10]

---

[8]Amtrak says that its records show that Edison called Amtrak customer service, rather than Amtrak police.  *See* ECF No. 62 at 2 n.2.

[9]Edison testified that Amtrak police did not return his call in a timely fashion because of a shift change.  Edison Dep. 55:17–56:7.

[10]The complaint alleges that Henin made "blatantly abusive and discriminatory comments."  Compl. ¶ 15.  Once again, though, there is not a shred of evidence in the record supporting this serious accusation.  To the contrary, video evidence shows that Henin did not make any abusive or discriminatory remarks, but instead treated Edison civilly.  *See* Sarantopoulos Decl. Exs. B-2, B-3, B-4; Thompson Decl. Ex. N.  The Court again reminds Edison and his attorneys that they should not publicly accuse a defendant of something as reprehensible as making racist comments without "evidentiary support."  Fed. R. Civ. P. 11(b)(3).

In the meantime, Henin spoke with Grealish about Edison. Henin Dep. 79:17–24 (noting one conversation); Grealish Dep. 30:24–31:24, 35:22–36:17, 47:10–18 (noting two conversations). Henin told Grealish what had occurred and that he planned to remove Edison from the train. Grealish Dep. 31:6–32:11, 33:9–14. Grealish then informed Sikkink-Spence of the situation.[11] Grealish Dep. 50:1–10.

At some point after Henin first asked Edison to return to his original seat, Edison decided to start taking photographs (using a flash) of his fellow passengers and of empty seats. Edison Dep. 96:6–10, 108:13–20, 109:13–15, 110:22–23, 112:23–113:17; Sarantopoulos Decl. Exs. B-1, H. Many of the passengers were sleeping, and none had given Edison permission to photograph them. Edison Dep. 112:21–114:21. Edison testified that he took these photos to show that other passengers were occupying two seats. Edison Dep. 96:6–10. At least one of the passengers in the photos is black. Edison Dep. 118:8–10. Multiple passengers complained to Henin and Grealish about Edison taking the photos. Henin Dep. 85:7–12; Grealish Dep. 68:24–69:8, 71:3–72:6. Henin then confronted Edison about his behavior. Henin Dep. 86:3–11; Thompson Decl. Ex. J, ECF No. 60-2 at 15.

---

[11]Sikkink-Spence testified that he was present when Henin told the engineers that police would be waiting at Staples to remove a passenger, but that he did not otherwise speak with Henin about Edison before Edison's removal. Sikkink-Spence Dep. 42:1–18.

Finally, at some point during the trip, Henin[12] contacted the Staples Police

Department to request assistance in removing Edison when the train arrived at Staples.

Sarantopoulos Decl. Ex. F, ECF No. 49-10 at 2.

After the train arrived in Staples, about 15 to 25 passengers boarded, a number of

whom were traveling together in a group.[13] Grealish Dep. 51:24–52:4. Grealish boarded

the passengers through a different car while Henin handled Edison's removal. Grealish

Dep. 47:23–48:13; Henin Dep. 68:20–69:5, 105:15–20. Edison had fallen asleep and was

awakened by Henin telling him that he needed to leave the train. Edison Dep.

74:19–75:4, 80:12–13. Edison asked why he was being removed from the train; Henin

responded that Edison was being removed because he had not followed instructions.

Edison Dep. 75:6–14. Henin then walked away from Edison's seat. Edison Dep.

75:13–17.

---

[12]Edison's attorney argues that Henin testified that he did not call the Staples
Police Department. In fact, Henin testified at his deposition that he could no longer
recall if he called the Staples police. Henin Dep. 169:5–11. Henin's contemporaneous
incident report makes clear that Henin did in fact call the Staples police. Sarantopoulos
Decl. Ex. F, ECF No. 49-10 at 2.

[13]Edison testified that he took photographs of the train platform to show that
there was no group of passengers. Edison Dep. 101:17–25. But Edison also conceded
that one of his photographs shows a group of passengers boarding the train through a
different car. Edison Dep. 102:1–11. Grealish testified that a group of passengers did in
fact board the train at Staples. Grealish Dep. 51:24–52:4; *see also* Henin Dep. 68:20–69:5.

Henin exited the train and met Officer Chris Goff of the Staples Police Department on the platform. Henin Dep. 101:4–102:18. They had a brief conversation, during which Sikkink-Spence arrived, and then the three men boarded the train and returned to where Edison was sitting. Sikkink-Spence Dep. 43:8–14; Edison Dep. 75:16–17, 76:10–15; Thompson Decl. Ex. N at 01:00–01:15, 01:54–02:33. Edison recorded the incident, and his recording shows that Edison was asked to leave the train several times. Sarantopoulos Decl. Exs. B-2, B-3, B-4; *see also* Sikkink-Spence Dep. 49:10–51:5; Edison Dep. 122:11–14; Thompson Decl. Ex. N. Edison initially refused to disembark, again protesting that there were no reserved seats in coach. Sarantopoulos Decl. Exs. B-2 at 00:16–00:28, 00:48–00:53 & B-4 at 00:44–00:53, 01:08–01:13; Sikkink-Spence Dep. 49:10–51:5. Henin again explained that the seats had been reserved for a group of 40 passengers. Sarantopoulos Decl. Ex. B-2 at 00:37–00:43; Henin Dep. 104:7–18.

During this interaction, Edison asked Henin for his name. Henin responded that his name was "Dave." Edison Dep. 100:18–24; Sarantopoulos Decl. Ex. B-4 at 00:30–00:33. Henin could not recall why he gave Edison an incorrect name. Henin Dep. 161:1–7. Finally, after a few minutes and several requests to leave, Edison said that he felt uncomfortable and would disembark. Sarantopoulos Decl. Ex. B-4 at 01:38–01:48; Edison Dep. 80:22–81:3; Thompson Decl. Ex. N at 03:05–08:30.

Edison, Officer Goff, Henin, and Sikkink-Spence exited the train and walked onto the platform. Sikkink-Spence Dep. 56:2–9. Eventually, Henin and Sikkink-Spence re-boarded the train, and the train left. Sikkink-Spence Dep. 58:19–24. Officer Goff and Edison then discussed what Edison should do next.[14] Thompson Decl. Ex. N at 31:03–32:20.

The train station at Staples is unattended, meaning that no Amtrak employees were present.[15] Moreover, Staples is a small rural town without a bus stop, cab service, or the like. Thompson Decl. Ex. N at 25:00–26:24. Officer Goff told Edison that a nearby gas station was open. Thompson Decl. Ex. N at 31:50–32:12. Edison walked to the gas station and waited there without incident for several hours, until a friend arrived to pick him up and drive him to the Twin Cities. Edison Dep. 89:3–24. While waiting for his ride, Edison called several friends and family members to inform them of his removal from the train. Edison Dep. 90:10–95:6.

Edison testified that, after being removed from the train, he felt unsafe and feared for his life. Edison Dep. 154:18–155:5. Edison also testified that he now suffers

---

[14]After the train left, Edison and Officer Goff also spoke on the phone with Amtrak Police Officer Carroll about the incident; this conversation can be heard on the dash-camera footage. Thompson Decl. Ex. N at 14:02–30:55. Edison did not recall this phone conversation at his deposition. Edison Dep. 87:4–11.

[15]Henin testified that part of the reason why he called Staples Police was so that Edison would not be left alone at the unmanned station. Henin Dep. 158:25–159:8.

from sleepless nights, is afraid of the police, and is seeing a therapist.[16]  Edison Dep.

158:2–15.  Finally, Edison claims that, as a result of being removed from the train, he

was unable to do something that he wanted to do in the Twin Cities, although he has

given several conflicting accounts of why he was traveling to the Twin Cities on

May 29, 2019.[17]

In sum, although some minor details of the incident are either unclear or

disputed, the material facts are not in dispute:  (1) Henin cleared a block of seats for an

anticipated group of passengers; (2) Edison took a seat in that reserved block of seats;

(3) Edison was the only passenger who tried to sit in that reserved block of seats;

(4) Henin explained to Edison why the block of seats had been cleared and asked him to

move multiple times; (5) Edison refused to comply with Henin's instructions; and

---

[16]Amtrak notes that Edison did not start to see a therapist until the week before his deposition.  Edison explains, though, that he started looking for a therapist in 2019 but had difficulty finding one because of the shortage of black therapists (Edison testified that he wanted to be treated by such a therapist), the impact of the pandemic, and problems with his insurance.  Edison Dep. 215:1–218:18.

[17]At his deposition, Edison testified that he was planning to file child-custody papers, but that he did not have an appointment or court date.  Edison Dep. 38:17–40:4. At the time of the incident, however, Edison told Amtrak personnel that he had "an important court date" related to child support.  Sarantopoulos Decl. Ex. B-4 at 00:37–00:42; *see also* Thompson Decl. Ex. N at 14:37–14:45 (stating he was missing a "child support court date that . . . [he] had to appear at").  In his customer complaint to Amtrak, Edison wrote that his removal from the train caused him to miss a "child custody arrangement."  Thompson Decl. Ex. J, ECF No. 60-2 at 5.  Finally, at oral argument, Edison's attorney said that Edison was scheduled to appear in court for a custody hearing.

(6) Edison was the only passenger on the train who refused to comply with an

instruction from a conductor.  Edison Dep. 140:20–141:4, 144:9–16, 145:9–12; Henin Dep.

78:22–79:13.

### C.  Subsequent Events

After the incident, Henin completed a Passenger Incident Report, writing:

> Seated a passenger next [to] Edison, Edison said he bought
> the seat and nobody can sit by him.  I advised him I had
> groups getting on ahead and I needed all seats.  He got up
> and told me ["]watch me["] and moved to another seat.
> I warned him several times to return to his seat and he
> ignored me.  After explaining several times that we had 40+
> people getting on in 2 stops, he just refused to return to his
> seat.  I went to the lounge car to regroup on a plan of action.
> I went back in[,] gave him one warning to return and he
> refused so I contacted police [in] Staples[.]

Sarantopoulos Decl. Ex. F, ECF No. 49-10 at 2.

For his part, Edison filed a complaint with Amtrak in July 2019 and for the first

time accused Henin of race discrimination.[18]  Sarantopoulos Decl. Ex. B-6, ECF No. 49-6

at 1; Edison Dep. 147:25–148:2.  The complaint was investigated by James Hlavaty,[19] the

Assistant Superintendent of Operations in the Central Division.  Sikkink-Spence Dep.

---

[18]Edison also uploaded videos of the incident to YouTube on June 5, 2019.
Edison Dep. 195:1–20; Thompson Decl. Ex. F.

[19]Normally, Sikkink-Spence would have investigated the complaint, but because
Sikkink-Spence was involved in the incident, Hlavaty conducted the investigation.
Hlavaty Dep. 21:12–22:10.

24:11–13.  Hlavaty interviewed Edison and Sikkink-Spence and reviewed the incident

report and written statements from Henin and Grealish.  Hlavaty Dep. 39:10–40:23,

71:13–24, 74:4–10.  Hlavaty closed the investigation after he concluded that Edison's

removal was justified.  Hlavaty Dep. 74:17–75:3; Sarantopoulos Decl. Ex. J.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law.  *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if

"the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor."  *Id.* at 255.

### B.  Federal Race-Discrimination Claims

Edison brings race-discrimination claims under 42 U.S.C. § 1981, 42 U.S.C.

§ 2000a ("Title II"), and 42 U.S.C. § 2000d ("Title VI").  The parties agree that Edison's

race-discrimination claims are all based on the same conduct.  The parties also agree

that Edison has no direct evidence of race discrimination and therefore his claims must

be evaluated under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Because of slight differences among the statutes, and for the sake of thoroughness, the Court will evaluate each claim individually.

## 1. Section 1981

Edison first alleges that Amtrak discriminated against him in violation of § 1981, which protects the right of all persons "to make and enforce contracts." As noted, the *McDonnell Douglas* burden-shifting framework applies to Edison's § 1981 claim. *See Harris v. Hays*, 452 F.3d 714, 717 (8th Cir. 2006). Edison can establish "a prima facie case under § 1981 by showing (1) membership in a protected class; (2) the intent to discriminate on the basis of race on the part of [Amtrak]; and (3) discrimination interfering with a protected activity (i.e., the making and enforcement of contracts)." *Id.* at 718 (citation and quotation marks omitted); *see also Combs v. The Cordish Cos.*, 862 F.3d 671, 681 (8th Cir. 2017). Once Edison establishes a prima facie case, the burden shifts to Amtrak to provide a legitimate, nondiscriminatory reason for its actions. *Harris*, 452 F.3d at 718. If it does so, the burden shifts back to Edison to show that Amtrak's proffered reason is a "pretext for discriminatory animus." *Id.* Edison "bears the burden of showing that race was a but-for cause of [his] injury." *Comcast Corp. v. Nat'l Assoc. of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020).

The parties do not dispute the first or third elements of Edison's prima facie case; the issue, then, is whether Edison has shown that Amtrak intended to discriminate on the basis of race. This element is typically satisfied with evidence that a "similarly-situated person of another race received more favorable treatment." *Lucke v. Solsvig*, 912 F.3d 1084, 1087 (8th Cir. 2019). A similarly situated person of another race is referred to as a "comparator." To show race discrimination through evidence that a comparator was treated more favorably, Edison must prove that the comparator was "similarly situated in all relevant respects." *Id.* (citation and quotation marks omitted); *see also Macklin v. FMC Transp., Inc.*, 815 F.3d 425, 428–29 (8th Cir. 2016). What "respects" are "relevant" depends on the facts of the case. *Lucke*, 912 F.3d at 1087.

The closest that Edison comes to citing evidence of a comparator is his claim that no other passengers were "disturbed and hounded to move." ECF No. 59 at 12. But that claim fails for two reasons. First, Edison's claim is contradicted by the record, which contains undisputed evidence that, when Henin cleared the block of seats, he asked white passengers to move—or, as Edison would put it, he "disturbed and hounded" white passengers. *See* Henin Decl. ¶ 24. Second, Edison has no evidence that any white passenger (or, for that matter, any other passenger) sat in the reserved block of seats. To the contrary, the evidence is undisputed that only Edison insisted on sitting in the reserved block, and only Edison defied the instructions of a conductor. *See*

Edison Dep. 145:9–12.  In short, there is no evidence—none—that Henin was motivated by race when he asked Edison to move from the reserved block of seats or when he removed Edison from the train after Edison defied multiple instructions.

Even if Edison had established a prima facie case, Amtrak would be entitled to summary judgment because Amtrak has provided a nondiscriminatory reason for Henin's actions:  Henin was clearing a block of seats for a large group of passengers, and Edison refused to comply with Henin's instructions not to sit in the reserved section.[20]  This is a "clear and reasonably specific" explanation for the challenged conduct that satisfies Amtrak's burden.  *Lucke*, 912 F.3d at 1087 (citation and quotation marks omitted).  And Edison provides no reason to believe that this explanation is pretextual, either by "discredit[ing] [Amtrak's] proffered reason[]" or by presenting "evidence that raises a genuine doubt as to the legitimacy of [Amtrak's] motives."  *Id.* at 1089.

---

[20]Amtrak emphasizes that passengers complained to Henin and Grealish about Edison taking flash photographs on the train, and it argues that this provides another nondiscriminatory reason for Edison's removal.  But there is little evidence that Amtrak removed Edison from the train because he was taking photographs; to the contrary, Henin testified that the reason for removing Edison was his "[r]efusal to leave a seat that [Henin] had made space for."  Henin Dep. 98:14–18.  As a result, the Court is not relying on the passenger complaints about Edison's taking photographs in granting summary judgment to Amtrak.  Thus, the parties' apparent dispute over the precise number of passengers who complained to Henin is not material.

Edison makes much of the fact that Henin cannot remember the exact number of people who were in the anticipated group and does not remember exactly where those people were expected to board the train. But throughout all of Henin's interactions with Edison on May 29, 2019 (as shown in Edison's own video)—as well as in Henin's later incident report and deposition testimony—Henin has been consistent in explaining the reason for his actions: He wanted to clear a block of seats for a large group that would be boarding the train. *See* Edison Dep. 64:8; Sarantopoulos Decl. Ex. F, ECF No. 49-10 at 2; Sarantopoulos Decl. Exs. B-2 at 00:37–00:43 & B-4 at 00:09–00:12. Henin's inability to remember the precise number of people in the anticipated group—or how many people would be getting on at what stops—when he was deposed 19 months after the incident does not provide evidence of pretext.[21]

Without evidence, Edison is "merely disputing" Amtrak's explanation for its actions, and accusations that are unsupported by evidence do not "raise a genuine doubt as to the legitimacy of [Amtrak's] motive." *Lucke*, 912 F.3d at 1088 (citation and quotation marks omitted); *see also Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir. 1994) (affirming grant of summary judgment on Title VII race-

---

[21]The Court notes that it would not matter if Henin had been lying about why he cleared a block of seats. What matters is that, whatever Henin's motivation, it plainly was not racial animus, as he cleared the block of seats by moving *white* passengers, and he did not allow *any* passenger—including white passengers—to sit in the cleared section.

discrimination claim when the plaintiff's only evidence of pretext was "his own unsubstantiated allegations in deposition" that he was treated differently than similarly situated white employees). Since Edison has neither established a prima facie case nor shown that Amtrak's legitimate reason for its actions is pretextual, his § 1981 claim fails. The Court therefore grants summary judgment to Amtrak on this claim.

## 2. Title II

Edison next claims that Amtrak discriminated against him in violation of Title II, which prohibits discrimination in public accommodations. *See* § 2000a. (The parties agree that Amtrak is a public accommodation.) This Court does not have jurisdiction over this claim.

"When a state or local law prohibits discrimination in a public accommodation and provides a remedy for such practice, § 2000a-3(c) requires notice to the state or local authority as a prerequisite to filing a civil action." *Childs v. Extended Stay of Am. Hotels*, No. 10-CV-3781 (SRN/JJK), 2012 WL 2126845, at *4 (D. Minn. June 12, 2012). Minnesota law prohibits discrimination in public accommodations and provides remedies for such discrimination. *See* Minn. Stat. § 363A.11, subd. 1(a)(1) (prohibiting race discrimination in public accommodations); Minn. Stat. § 363A.06 (empowering the Minnesota Department of Human Rights ("MDHR") to investigate charges of race discrimination in public accommodations). Edison was therefore required to file a charge with the

MDHR before bringing his Title II claim in federal court. *See Childs*, 2012 WL 2126845, at *4. He did not do so, and, as a result, this Court does not have jurisdiction to consider his Title II claim. *See Bilello v. Kum & Go, LLC*, 374 F.3d 656, 658–59 (8th Cir. 2004) (noting the requirement to file with state agency is a jurisdictional prerequisite to § 2000a claim).

Even if this Court had jurisdiction over Edison's Title II claim, the Court would reject it for the same reasons that it rejected his § 1981 claim. Edison's Title II claim, like his § 1981 claim, is analyzed under *McDonnell Douglas*. *See Childs*, 2012 WL 2126845, at *5 & n.1 (noting the Eighth Circuit has suggested but never explicitly stated that *McDonnell Douglas* applies to Title II claims, but several other circuits have done so). To establish a prima facie case, Edison must show that "(1) [he] is a member of a protected group; (2) [he] was similarly situated by circumstance to other individuals not members of such a group; and (3) [he] was treated more harshly or disparately than other similarly situated non-group members." *Id.* at *5 (citation and quotation marks omitted); *see also O'Neal v. Moore*, No. 06-CV-2336 ADM/JSM, 2008 WL 4417327, at *24 (D. Minn. Sept. 24, 2008), *aff'd*, 355 F. App'x 975 (8th Cir. 2009) (per curiam).

Edison cannot establish a prima facie case, because he has no evidence that Amtrak was motivated by race. In particular, Edison has no evidence that Amtrak treated him less favorably than a white passenger who was similarly situated to

him—i.e., a white passenger who insisted on sitting in the reserved section or who refused to follow a conductor's instructions. *See Adams ex rel. Harris v. Boy Scouts of Am.-Chickasaw Council*, 271 F.3d 769, 778 (8th Cir. 2001) (noting Title II claim failed "because the evidence does not adequately support the inference that race was a motivating factor in the decision to have [plaintiff] removed"); *Armstrong v. Target Corp.*, No. 10-CV-1340 (RHK/JJG), 2011 WL 4865056, at *1 (D. Minn. Oct. 13, 2011) (rejecting Title II claim when there was "simply no evidence that he was similarly situated to other non-protected-class customers or was treated disparately from such customers"). The Court therefore grants summary judgment to Amtrak on Edison's Title II claim.

### 3. Title VI

Finally, Edison claims that Amtrak discriminated against him in violation of Title VI, which prohibits race discrimination in programs receiving federal assistance. *See* § 2000d. (The parties do not dispute that Amtrak receives federal assistance.) Once again, *McDonnell Douglas* applies. *See Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 355 (8th Cir. 2020). To establish a prima facie case, Edison must show (among other things) that his race "was the motive for the discriminatory conduct." *Thompson ex rel. Buckhanon v. Bd. of Special Sch. Dist. No. 1*, 144 F.3d 574, 581 (8th Cir. 1998).

Edison's Title VI claim fails for the same reason that his other race-discrimination claims fail: He has no evidence that Amtrak was motivated by race in removing him from the train. *See Rowles*, 983 F.3d at 355 (rejecting Title VI claim when the plaintiff did not introduce evidence of comparators who, like him, were graduate students accused of sexual harassment and stalking).[22] The Court therefore grants summary judgment to Amtrak on Edison's Title VI claim.

### C. State-Law Claims

Edison brings two state-law claims against Amtrak: one for breach of contract, and one for intentional infliction of emotional distress ("IIED").

Amtrak argues that Edison's claims are preempted under the express-preemption provision of the Amtrak Act, which provides that "[a] State or other law related to rates, routes, or service does not apply to Amtrak in connection with rail passenger transportation." 49 U.S.C. § 24301(g). Although case law interpreting § 24301(g) is sparse, there is some support for Amtrak's position.[23] This Court

_____

[22]The Court also notes that "an entity may not be held vicariously liable for its employee's conduct under Title VI." *Sahu v. Minneapolis Cmty. & Tech. Coll.*, No. 14-CV-5107 (PJS/FLN), 2015 WL 13731342, at *5 (D. Minn. Oct. 9, 2015), *report & recommendation adopted*, 2016 WL 310727 (D. Minn. Jan. 26, 2016), *aff'd*, 674 F. App'x 606 (8th Cir. 2017) (per curiam), *cert. denied*, 138 S. Ct. 304 (2017). Edison's claim is based solely on Henin's conduct, *see* Edison Dep. 154:10–14, for which Amtrak cannot be held vicariously liable.

[23]*See Rubietta v. Nat'l R.R. Passenger Corp.*, No. 08 C 7117, 2012 WL 345909 (N.D. Ill. Jan. 30, 2012); *Jenkins v. Nat'l R.R. Passenger Corp.*, No. 07 C 3427, 2008 WL 68685

(continued...)

nevertheless has it doubts.  Under Amtrak's capacious interpretation of "service," it is difficult to imagine a state-law claim against Amtrak that would *not* be preempted.  Yet Congress clearly meant to protect Amtrak from only *some* state-law claims—specifically, claims that arise under "[a] State . . . law related to rates, routes, or service."

The language chosen by Congress suggests that it had in mind state laws *aimed at railroads*.  That is understandable; Amtrak cannot run an efficient national rail service if all 50 states are able to regulate its "rates" or "routes."  But the state laws on which Edison relies are simply generic common-law causes of action for breach of contract and IIED.  Needless to say, those causes of action are not aimed at railroads; they apply to everyone, including individuals and companies that (like Amtrak) are active in many states.  It is difficult to believe that Congress meant to allow Amtrak to breach contracts or commit intentional torts without consequence.

The Court need not resolve this issue, however, because Edison's state-law claims clearly fail on the merits.  The Court now turns to those claims.

1.  Intentional Infliction of Emotional Distress

In order to recover for IIED, Edison must show that:  "(1) the conduct complained of was extreme and outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; (4) and the distress suffered was severe."

---

[23](...continued)
(N.D. Ill. Jan. 3, 2008).

*Kelly v. City of Minneapolis*, 598 N.W.2d 657, 663 (Minn. 1999) (citing *Hubbard v. United Press Int'l, Inc.*, 30 N.W.2d 428, 438–39 (Minn. 1983)). To be held liable, a defendant "must intend to cause severe emotional distress or proceed with the knowledge that it is substantially certain, or at least highly probable, that severe emotional distress will occur." *K.A.C. v. Benson*, 527 N.W.2d 553, 560 (Minn. 1995). The bar for recovering on an IIED claim is high, as the Minnesota Supreme Court has "sharply limited" the tort "to cases involving particularly egregious facts." *Hubbard*, 330 N.W.2d at 439.

Edison's claim fails on multiple levels. To start, Henin's conduct was not extreme and outrageous. Conduct is extreme and outrageous when it is "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Id.* (citation and quotation marks omitted). "[I]nsults, indignities, threats, annoyances, petty oppressions, or other trivialities" are not extreme and outrageous. *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 865 (Minn. 2003) (citation and quotation marks omitted).

Henin asked Edison to move from one seat to another. When Edison refused to move, Henin warned him that he would be removed from the train, and gave Edison several more opportunities to change seats. After Edison continued to defy Henin's instructions, Henin had him removed at the next station. There was nothing extreme or outrageous about Henin's conduct. *See id.* at 866 (listing as an example of conduct that

was not extreme or outrageous "calling the police and having the plaintiff physically removed from a meeting . . . even if the removal was not warranted" (citing *Holland v. Sebunya*, 759 A.2d 205, 212 (Me. 2000))).[24]  Even if it was "clearly unreasonable" for Henin to ask Edison to move or for Henin to remove Edison from the train, Henin's actions still cannot be characterized as "utterly intolerable in a civilized society." *Shank v. Carleton Coll.*, 232 F. Supp. 3d 1100, 1114 (D. Minn. 2017).  As this Court has noted, "[c]ivilized societies tolerate a lot of unreasonable conduct." *Id.*

Edison has also submitted no evidence that Henin intended to cause him severe emotional distress.  *See K.A.C.*, 527 N.W.2d at 560.  Nothing in the record suggests that Henin was motivated by anything other than the desire to clear a block of seats for a group of passengers.  *See, e.g.*, *Griefenhagan v. Knight*, No. 12-CV-1182(DSD/SER), 2013 WL 4050202, at *5 (D. Minn. Aug. 9, 2013) (granting summary judgment when there was "no evidence that [defendant] intended to cause severe emotional distress or undertook

---

[24]A review of judicial decisions in which IIED claims were found to be colorable confirms that Henin's actions fell far short of extreme and outrageous.  *See, e.g.*, *Shqeirat v. U.S. Airways Grp., Inc.*, 515 F. Supp. 2d 984, 1002–03 (D. Minn. 2007) (denying motion to dismiss when Muslim plaintiffs alleged they were removed from airplane, arrested, handcuffed, held on the jetway for 45 minutes, forced to reboard the plane to retrieve their luggage, escorted through the airport in handcuffs, subjected to thorough searches and questioning, and detained in cells or small rooms for several hours, all because of a discriminatory motive); *Wenigar v. Johnson*, 712 N.W.2d 190, 207–08 (Minn. Ct. App. 2006) (finding conduct was extreme and outrageous when employer forced disabled employee to work without pay and often without breaks, repeatedly taunted him, provided him with uninhabitable living quarters, and made him afraid to quit his job).

actions that he should have known would cause such distress"); *Schmidt v. HealthEast*,

No. C1-96-152, 1996 WL 310032, at *2 (Minn. Ct. App. June 11, 1996) (affirming grant of

summary judgment when there was "no evidence of an intent to cause" distress).

Finally, Edison has not introduced evidence that the emotional distress that he

suffered was sufficiently severe to enable him to recover for IIED. The Minnesota

Supreme Court has held that, to recover for IIED, a plaintiff must suffer emotional

distress "so severe that no reasonable man could be expected to endure it." *Hubbard*,

330 N.W.2d at 439 (citation and quotation marks omitted). Edison claims that he feared

for his life when he was removed from a train at an unmanned station in a small town,

and he claims that he now suffers from sleepless nights and fear of the police. Edison

Dep. 154:18–155:5, 158:2–15. But similar types of emotional distress have been held to

be insufficiently severe to support an IIED claim. *See Njema v. Wells Fargo Bank, N.A.*,

124 F. Supp. 3d 852, 877 (D. Minn. 2015) ("dread, anxiety, and fear" inadequate), *aff'd*,

673 F. App'x 609 (8th Cir. 2017) (per curiam); *Besett v. Wadena County*, No. 10-CV-0934

(JRT/LIB), 2010 WL 5439720, at *17 (D. Minn. Dec. 7, 2010) ("'reoccurring headaches,

night sweats, insomnia, illness and physical pain'" inadequate), *report and*

*recommendation adopted*, 2010 WL 5441937 (D. Minn. Dec. 28, 2010); *Langeslag*, 664

N.W.2d at 869–70 (stomach pain, hair loss, weight loss, eczema, and aggravation to

diabetes inadequate when the plaintiff failed to introduce "medical testimony" that

defendant's conduct was the cause); *Hubbard*, 330 N.W.2d at 440 (depression, vomiting, stomach problems, rash, and high blood pressure inadequate); *Odegard v. Finne*, 500 N.W.2d 140, 144 (Minn. Ct. App. 1993) (depression, impaired ability to trust, and damaged relationship with children inadequate).

For these reasons, the Court grants summary judgment to Amtrak on Edison's IIED claim.

## 2. Breach of Contract

Finally, Edison claims that Amtrak breached a contract—specifically, his ticket—when it removed him from the train. For the purposes of its motion, Amtrak concedes that Edison's ticket was a contract. *See* ECF No. 48 at 32. But Amtrak argues that it did not breach that contract because the contract allowed Amtrak to refuse to carry passengers who did not follow instructions.

The Court agrees. The Conditions of Carriage applied to every ticket, including Edison's. Henin Decl. ¶ 5. One of those conditions was that "Amtrak may refuse to carry passengers . . . [w]ho refuse to comply with safety or security rules *or with instructions of Amtrak personnel*." Henin Decl. Ex. B, ECF No. 51-2 at 29 (emphasis added). It is undisputed that Edison failed to comply with Henin's instructions. In removing Edison from the train, then, Amtrak was exercising its right under the contract to refuse to carry noncompliant passengers. Amtrak did not breach the

contract, and it is entitled to summary judgment on Edison's claim. *See Precision Diversified Indus. v. Colgate*, No. A03-2060, 2004 WL 2093532, at *13 (Minn. Ct. App. Sept. 21, 2004) ("[W]hen a party has discretion under the contract to do the alleged unlawful act, that party cannot be held liable for breach of contract . . . ." (citation omitted)); *cf. Bebo v. Delander*, 632 N.W.2d 732, 738 (Minn. Ct. App. 2001) (finding employer did not breach contract by reassigning employee to different route when contract gave employer discretion to do so); *Sterling Cap. Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 124–25 (Minn. Ct. App. 1998) (finding shareholders did not breach contract by rejecting offers when contract allowed them to do so).

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1. Defendant's motion for summary judgment [ECF No. 46] is GRANTED.

2. Plaintiff's complaint [ECF No. 1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  June 18, 2021                              s/Patrick J. Schiltz
                                                   Patrick J. Schiltz
                                                   United States District Judge